**Yvonne M. BARRY, Plaintiff,**

**v.**

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

**No. C94–4043.**

United States District Court,
N.D. Iowa,
Western Division.

March 15, 1995.

David A. Scott of Cornwall, Avery, Bjornstad & Scott, Spencer, IA, for plaintiff.

Willis A. Buell, Asst. U.S. Atty. of the U.S. Attorney's Office, Sioux City, IA, for defendant.

## TABLE OF CONTENTS

I. INTRODUCTION 1230

 A. Factual background 1230
 B. The court's jurisdictional basis 1239
 C. Procedural background 1240

II. ANALYSIS 1241

 A. The "substantial evidence" standard 1241
 B. The *Polaski* standard and subjective pain credibility determinations 1242
 C. Relative burdens of proof 1242
 D. The ALJ's credibility analysis 1244

 1. The ALJ's analysis of the medical evidence 1244
 2. Alleged contradictions in Barry's testimony 1246
 a. Alleged contradictions regarding medical reports 1246
 3. The lack of a physician's disability finding 1247
 4. Barry's back and knee problems 1247
 5. Barry's daily activities 1249
 6. Barry's asserted lack of concentration 1250
 E. The hypothetical questions 1251

 1. Vocational analysis required 1251

III. CONCLUSIONS 1253

---

ORDER REVERSING AND REMANDING THE SECRETARY'S DENIAL OF DISABILITY BENEFITS

BENNETT, District Judge.

The court has before it plaintiff's resisted appeal from the Secretary's denial of her application for Supplemental Security Income (SSI) benefits pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* This case presents the issue of whether the Secretary had before her substantial evidence from which she could determine that plaintiff was not disabled. For reasons stated below, the court is persuaded that the Secretary's denial was not supported by substantial evidence and must accordingly be reversed and remanded.

## I. INTRODUCTION

### A. Factual background

Plaintiff Yvonne M. Barry is a 40 year old, Spencer, Iowa woman with a high school education. (*Tr. 38*). She is five feet, six inches tall and has a moderate weight problem; over the past five years, she has weighed between 172 pounds (*Tr. 155*) and 221.5 pounds. (*Tr. 166*). From 1978 to 1991, Barry worked at a factory called Witco where she assembled and packaged products and boxes, and eventually became a packaging machine operator. (*Tr. 39; 118*). The assembly job included alternating between sitting, standing and bending. *Id.* Barry quit working at Witco on September 9, 1991. (*Tr. 42*). At an administrative hearing held on June 17, 1993, Barry testified that she left Witco voluntarily for a variety of reasons which included personality conflicts with her supervisor, a requirement that she perform services which exceeded those ordered by her doctor and recurrent back and knee pain which resulted in an inability to concentrate. (*Tr. 40–41*).

After leaving Witco, Barry worked for "around two weeks" in August, 1992 at the Gift Gallery, helping to package items which she lifted from shelves and placed into boxes. (*Tr. 42*). Barry testified that this was "work that I had done previously at the [Witco] plant, you know, so it wasn't very difficult...." *Id.* She also washed dishes at the Clay County Fair for six days in September, 1992. (*Tr. 110*). In February, 1993, Barry began working as a part-time housekeeper at a motel called The Lamplighter for between $60 and $120 per week. (*Tr. 43*). She was still working there at the time of the June 17, 1993 administrative hearing. (*Tr. 42*).

The medical record in this case is scant; a mere 34 pages long. (*Tr. 136–70*). Nonetheless, a great deal of information about Barry's physical condition can be gleaned from this evidence. Between 1989 and 1990, prior to Barry's leaving Witco, x-rays of her dorsal spine[1] revealed "dorsal kyphosis[2] with degenerative disc disease and some lipping[3] of vertebral bodies." (*Tr. 141*). A later review of those x-rays revealed that Barry has dorsal spine degenerative disc disease and arthritis. *Id.*

On July 25, 1991, Barry was prescribed Lodine[4] for what the reviewing doctor opined was either left knee bursitis or arthritis. (*Tr. 147*). Progress notes indicate that on August 12, 1991 Barry's "knees were doing well on the Lodine and when she stopped it, the pain came back." (*Tr. 146*). On August 15, 1991, Barry reported that she was "unable to kneel or walk long distances until knee better." *Id.* On August 21, 1991, Barry reported that she was "unable to kneel or walk long distances" and that she could "only stand 2 hrs. @ a time and then needs sit-down break." *Id.* Barry's progress notes reveal that on September 5, 1991, her left knee was

> giving her troubles. Initially, the Lodine helped but not now. Seems to be worse if she's up and around on it. Otherwise it isn't too bad. It will occasionally swell. There is no swelling or redness and no point tenderness. No crepitus[5] with motion. Complete ligamentous exam is done and is negative. X-ray is negative. *Id.*

The physician's opinion after examining Barry on September 5, 1991 was that she had "(p)robable left knee arthritis." *Id.* The physician wrote a note to Witco on Septem-

1. The dorsal spine is the rear portion of the spine. *Dorland's* at 505.

2. Kyphosis is an abnormality in a person's spine which causes he or she to have a hunch back. *Dorland's* at 886.

3. Lipping is defined as "the development of a bony overgrowth in osteoarthritis." *Dorland's* at 946. Osteoarthritis is defined as a "noninflammatory degenerative joint disease occurring chiefly in older persons.... It is accompanied by pain and stiffness, particularly after prolonged activity." *Dorland's* at 1197.

4. Lodine is the brand name for the drug "etodolac." It is a non-steroidal anti-inflammatory drug which is produced by Wyeth–Ayerst Laboratories in 200 and 300 milligram capsules and 400 milligram tablets. *Physician's Desk Reference (PDR)* (49th ed. 1995) at 2682.

5. Crepitus is defined as "the cracking sound produced by the rubbing together of fragments of fractured bone." *Dorland's* at 395.

ber 13, 1991 stating that Barry was not to lift more than 20 pounds and could only "stand for one period [and] sit the next alternatively." *Id.* He further ordered that Barry "continue Feldene [and] Tylenol" for pain. *Id.* On September 25, 1991, the physician ordered that Barry take "Feldene 20 mg. ½ daily with food." (*Tr. 147*).

On October 13, 1991, Barry told her physician that she "has gone off the Feldene because she can't afford to buy any more. Her knees still bother her. She hasn't really been doing her exercises either." (*Tr. 145*). On October 16, Barry was seen by Orthopedic Surgeon Dr. Rick Wilkerson, who described her as being "moderately overweight." (*Tr. 136*).[6]

Dr. Wilkerson diagnosed Barry as having squinting patellae bilaterally.[7] During the examination, Barry was "unable to squat all the way down and stand back up due to knee pain." *Id.* As well, Barry demonstrated "marked J signs bilaterally"[8] during an examination performed while she was sitting down. *Id.* After examining Barry in a supine position[9] Dr. Wilkerson observed that Barry "does appear to have a left knee effusion,[10] although it's somewhat difficult due to obesity[11] of the leg." *Id.*

Dr. Wilkerson noted that Barry had "diffuse tenderness everywhere in her knees, both medial[12] and lateral[13] joint line, patellofemoral joint,[14] etc." *Id.* He found that Barry's ligaments were normal, but also observed that her kneecaps were hypermobile.[15] *Id.* Beside the heading "Impression," Dr. Wilkerson diagnosed Barry as having "(b)ilateral patella alta[16] with resultant patellofemoral[17] pain." *Id.* He accordingly gave Barry a knee sleeve for support, ordered a follow-up examination,[18] and told Barry to use Feldene[19] for relief. *Id.* In

---

**6.** At the time of the administrative hearing, Barry testified that she weighed between 195 and 200 pounds. (*Tr. 58*).

**7.** The court is uncertain as to this diagnosis. It has consulted two respected medical dictionaries, *Stedman's Illustrated Medical Dictionary* (25th ed. 1990) and *Dorland's Illustrated Medical Dictionary* (27th ed. 1988) and has not found an appropriate definition. The "patellae" are knee caps. *Dorland's* at 1241. Patellae are usually described as being either "floating" or "slipping," *Id.*, but not "squinting." "Bilateral" means "pertaining to both sides." *Dorland's* at 205. The court can only conclude that there was something remarkable about Barry's knee caps which affected them on both sides, but is not certain how severe this disorder is or whether it is either permanent or debilitating.

**8.** The court's resources do not define what "J signs" are. However, the term "j" is more than likely related to a junction between bones or between cartilage. See *Stedman's* at 816–17. The court is accordingly uncertain as to the significance of this finding.

**9.** The supine position is the position where the patient is "lying with the face upward." *Dorland's* at 1614.

**10.** An effusion is defined as "the escape of fluid into a part or tissue." *Dorland's* at 532.

**11.** Obesity is defined as "an increase in body weight beyond the limitation of skeletal and physical requirement, as the result of an excessive accumulation of fat in the body." *Dorland's* at 1163.

**12.** Medial refers to the middle of the joint. *Dorland's* at 991.

**13.** Lateral refers to the side of the joint. *Dorland's* at 898.

**14.** Patellofemoral pertains to the joint connecting the thigh bone with the kneecap. *Dorland's* at 617; 1241.

**15.** Hypermobility is defined as an "(i)ncreased range of movement of joints [or] joint laxity, occurring normally in young children or as a result of disease . . . [which] may result in degenerative joint disease." *Stedman's* at 742.

**16.** Upon reviewing both of its medical dictionaries, as well as Webster's Encyclopedic Unabridged Dictionary of the English Language, 1989, the Court is unable to discern the meaning or significance of this diagnosis.

**17.** See footnote 14, above.

**18.** According to a letter dated May 6, 1992, Dr. Ronald J. Creswell of Spencer Medical Associates P.C. informed Ronald Naeve of Vocational Rehabilitation Services that Barry had not undergone a follow-up review with Dr. Wilkerson because she could not afford to do so. (*Tr. 139*).

**19.** Feldene is the brand name of the drug "piroxicam" which is distributed in 10 and 20 milligram capsule dosages by Pratt Laboratories. It is an anti-inflammatory medication. *PDR* at 324, 1900.

his note, Dr. Wilkerson also stated that he was planning to provide Barry with an exercise book because he felt there were some exercises which would alleviate her patello-femoral pain. *Id.*

In a November 21, 1991 letter, Dr. Ronald J. Creswell of Spencer Medical Associates, P.C. wrote to Barry regarding the possibility that she might be considered medically "disabled." (*Tr. 137*). At the outset, Dr. Creswell stated: "I do not do disability ratings. You would have to discuss this with Dr. Wilkerson as he does those rating [*sic*] and he is the one who made the diagnosis and is familiar with this condition." *Id.* Dr. Creswell nonetheless gave Barry some medical advice. Specifically, he recommended "that you continue to do the exercises that Dr. Wilkerson suggested and work at losing weight and take the Feldene. I would not recommend doing any prolonged kneeling or bending at work. I would not recommend any long distance walking at work." *Id.*

On February 12, 1992, Barry was experiencing "tenderness and slight swelling of both knees" and was diagnosed as suffering from "bilateral knee arthritis." (*Tr. 144*). On March 2, 1992, Barry had the same complaints and her examining physician wrote the following observations:

She basically has degenerative arthritis of her knees and isn't accepting of this fact. She is very bitter about the fact that she has this. She isn't coping with this well. She is depressed. Hasn't been on any anti-depressants. She is basically feeling sorry for herself because of her chronic pain and her situation. Complains of not being employed but then doesn't do anything to change that. We addressed the situation and discussed at length what she needs to do including getting a hold of Social Services and seeing what program she qualifies for and also to get some funding to help with her disease so she can get physical therapy, etc. In the meantime continue Feldene but also started Pemelor[20] 50 mgs... to see if this will

help her depression. Have her get back to me in the next couple of weeks.

*Id.* On March 18, 1992, Barry was enrolled with the Division for Rehabilitation Services. The intake summary from that day reveals the following:

Disability: Yvonne describes her disability by stating, "I have degenerative arthritis in my knees and also arthritis in the spine. I am not being able to work and losing out on my income has caused me alot [*sic*] of anxiety."

Limitations: In this regard, client states, "I can't sit or stand for long periods. I also can't walk greater distances and can't lift heavy loads. I find it difficult to concentrate at times." Yvonne states, regarding how she copes—compensates with stated limitations, by adding, "I simply don't sit too long or don't walk to [*sic*] far. I take Feldene (medication) for my knees swelling and also a mild tranquilizer to help me sleep and to decrease anxiety and depression. I wear knee stabilizers and I am on a diet to lose weight." Regarding how limitations interfere with getting and/or keeping employment, client states, "My former jobs involved standing for long periods of time on concrete floors—alot [*sic*] of lifting and reaching. All I have really known is factory work and if a person can't stand, lift, and walk in a factory they're considered not worth much." In reference to what the client expects as to DVRS[21] assistance—"I'd like retraining for a job I can handle physically and feel productive again at a job I enjoy."

Personal: Cl indicates standing 5'6" tall and weighing 190 pounds. General appearance—neat and appropriate. Regarding mental and emotional characteristics, client indicates "Feelings of anxiety." Yvonne established fairly good eye contact with counselor. She appears to be well oriented by comprehending interview questions and information—thought processes were logical and easily followed. Client appears work oriented by express-

---

**20.** Pemelor is the brand name for the drug "nortriptyline HC1" which is produced by the Sandoz Company. It is "indicated for relief of symptoms of depression." *PDR* at 2176–77.

**21.** DVRS is an acronym for Division for Vocational Rehabilitation Services. (*Tr. 2*).

ing understanding, interest and motivation in DVRS. Family—Yvonne is single currently living with her parents in Spencer who are retired. Regarding their support, client states, "They're letting me live with them and that says alot [*sic*] right there." Client indicates good—positive peer and community relationships. No communication skills problems indicated—noted.

(*Tr. 154*). On April 1, 1992, Barry's physician concluded that "(a)s far as her knees and arthritis go, she is doing better on the Feldene and [I] will have her continue on that." (*Tr. 143*).

In a letter dated April 3, 1992, Dr. Wilkerson responded to an inquiry from Richard B. Naeve of the Division of Vocational Rehabilitation Services regarding Barry's level of disability. (*Tr. 138*). Dr. Wilkerson gave a conflicting response. On the one hand, Dr. Wilkerson wrote that Barry had a "0 %" permanent impairment and a "good" prognosis if she completed her therapy with the knee sleeve, the Feldene and the exercise regimen. *Id.* On the other hand, however, Dr. Wilkerson wrote that "the patient has just been seen here once and is undergoing initial treatment. Therefore and [*sic*] permanent impairment rating, etc. would be inappropriate at this time." *Id.*

In a May 6, 1992 letter to Naeve, Dr. Creswell wrote that

> Miss Barry does suffer from chronic bilateral knee pain.... I am sure her knee pain is probably aggravated by her obesity.... Other than the chronic knee pain and depression, I do not feel she has any other disabilities. I feel her long-term prognosis would be good if she would allow us to aggressively seek special care for the knee problems.

(*Tr. 139*). On May 27, 1992, Barry filed for Social Security Disability benefits.

On June 9, 1992, Barry was examined by her physician regarding "chronic upper midback pain between her shoulders" which she stated she had been experiencing for several years. (*Tr. 142*). At that time, the physician reviewed Barry's past x-rays and determined that "she has significant dorsal kyphosis." [22] *Id.*

On June 11, 1992, Barry was prescribed Relafen [23] to relieve an arthritic condition revealed by x-rays taken of her spine. (*Tr. 141*). On June 15, 1992, Barry underwent a follow-up examination regarding the June 11, 1992 x-rays, and was diagnosed with dorsal spine arthritis and degenerative disc disease. Barry was ordered to follow a 1,200 to 1,500 calorie per day diet, and to continue taking the Relafen. *Id.*

On June 12, 1992, Barry was interviewed by a representative from the Division for Rehabilitation Services. Progress notes from the Division indicate that Barry was dieting and had started seeing a psychiatrist. [24] (*Tr. 152*). Notes from August 26, 1992 revealed the following concerning Barry's ability to find a job:

> Client does not possess useable—transferable job skills. Job expectations—none indicated. Job seeking skills—as a result of our interview—discussion, Yvonne felt that she lacks adequate job seeking skills information—training. Client also states that she lacks confidence in applying for employment including the job interview. Employment references—Witco Company, Spencer. Currently, client indicates that she is conducting job search efforts—registered at Spencer Jo[b] Services.

(*Tr. 153*).

In an October 9, 1992 letter to Phyllis Osterhaus of the Iowa Disability Determination Services, Chiropractic Orthopedist Rex J. Jones described Barry as follows:

> Patient is 5′6″, 172 lbs., with grossly distorted posture. Patient has both a lordotic lumbar spine and severely kyphotic thoracic spine and loss of normal cervical curve.

---

**22.** See footnote 2 for a description of "kyphosis."

**23.** Relafen is the brand name for the anti-inflammatory drug "nabumetone." It is produced by SmithKline Beecham in oval-shaped, 500 and 750 milligram tablets. *PDR* at 2395.

**24.** The "psychiatrist" listed was Nancy Visser. A review of the record shows that Ms. Visser actually holds only a Masters Degree in Social Work. (*Tr. 159*).

A spine of this interosseous [25] disposition when overworked or subjected to trauma will become markedly or protactedly symptom expressive. Patient has early degenerative arthritis of the vertebral joints along with pain and tenderness of the paravertebral musculature structures. Patient has decreased range of motion in the cervical, thoracic, and lumbar spine by at least 40%. This patient cannot stand or lift any weights more than 20 lbs. She cannot stand in one position longer than two hours without causing moderate to severe joint pain and muscle spasm. Patient also has flareups of her knees and elbows of a gener[al]ized [nature due to] osteoarthritic changes. Most recently patient stated that she was washing dishes for a cafe during fair week here in Spencer and it caused dramatic increase in her symptomatology and increased problems with her back and spine.

In my opinion this patient is a good candidate for retraining under the vocational programs.

(*Tr. 155*). On October 15, 1992, Osteopath David P. Robison of Spencer Medical Associates, P.C. responded to a request from the Disability Determination Services Bureau regarding Barry's physical condition. D.O. Robison noted that "I have never done a complete disability exam on Ms. Barry" because "(s)he sees one of my partners, Dr. Harold VanHofwegen." After reviewing Dr. VanHofwegen's file on October 15, 1992, D.O. Robison stated the following: "If she needs a disability exam, she'll need to be scheduled for that, but based on the information I have I don't think she qualifies for disability at this time." [26] (*Tr. 156*). Previously, however, on March 2, 1992, D.O. Robison concluded that Barry "has degenerative arthritis and chondromalacia [27] of the knee caps." (*Tr. 158*).

On October 21, 1992, Social Worker Nancy Visser reported the following to the Disability Determination Services Bureau:

Social History:

Yvonne is the youngest of five children in a family which appears to be enmeshed. Yvonne reported both her dad and older brother abuse alcohol and are critical and verbally abusive to the rest of the family members. Yvonne relays a history of difficulty in getting along with authoritative figures in both school and work. Yvonne's employment record shows this difficulty.

Mental Status:

Yvonne is neatly and appropriately dressed. Her posture and facial expressions are defeated. Yvonne has little eye contact, usually looking down. Her affect is flat and incongruent with her verbalized mood. Yvonne's attitude is despondent and pessimistic with some hostile tendancies. [*sic*] Her thought process/content and memory are all normal. Yvonne has excellent speaking abilities. Yvonne is pre-occupied with herself, desiring instant gratification, which clouds her judgment and insight.

Assessment of Mental Abilities for Employment:

Yvonne is an intelligent woman with an excellent memory who would be able to understand and carry out instructions. Working at a certain pace could cause anxiety for her. Yvonne's most immediate problem with employment would be interacting with co-workers and supervisors. She also would have difficulty adjusting to any change. Prognosis for improvement in this area is poor because Yvonne lacks motivation and support for change.

(*Tr. 159*). In an intake evaluation done prior to her letter to the Disability Determination

---

**25.** Interosseous refers to certain muscles and ligaments which lie between or connect bones. *Stedman's* at 793.

**26.** In an April 1, 1992 letter to Richard Naeve of the Division of Vocational Rehabilitation Services, D.O. Robison stated that he had "never really done a physical exam" on Barry, but had reviewed her file. (*Tr. 157*). Unfortunately for the court, potentially relevant information from that letter has been crossed out. It appears that

at some point someone may have highlighted the original of that document. The result is that the photocopy in the court's transcript looks as if whole sections have deleted. Accordingly, the court is unable to fully consider the document.

**27.** Chrondomalacia is defined as a "softening of the articular cartilage most frequently in the patella (knee cap)." *Dorland's* at 326.

Services Bureau, Visser summed up Barry's problems as follows:

> Yvonne walked off the job at Witco in Spencer in September of 1991. She had difficulty getting along with her lead person and supervisor. Since then she has been unable to find another job and her finances are dwindling. She is trying to get disability but doctors will not recommend her for such help.

(*Tr. 161*).

On November 11, 1992, Barry was examined by Psychiatrist Paul Anderson. After the examination, Dr. Anderson concluded the following:

> We have a lady here that I feel has kinda poor chronic self esteem. She has never married. Never had a date, never gone out with a boy and yet likes men does not like ladies. She has obviously had some problems with insubordination on the job finally resulting in them letting her go or her quitting whatever way you want to interpret that situation. It seems that she might have significant difficulties interacting with supervisors, co-workers, and the public and using good judgment in responding [to] appropriate changes in the work place. I do not feel that her memory or her cognitive functions are impaired in any way. I think she would carry out instructions and maintain attention, concentration and pace and remember and understand instructions, procedures and locations.

(*Tr. 165*). Dr. Anderson also determined that Barry suffers from dysthymic [28] disorder, possibly post-traumatic stress disorder [29] and borderline personality traits.

On January 6, 1993, Barry underwent a Social Security Disability exam conducted by D.O. Robison. (*Tr. 166*). The examination revealed that Barry weighed 221.5 pounds.

*Id.* At that time, D.O. Robison noted that Barry had "a marked kyphosis and dowager's hump [30] of the upper back because of the kyphosis." *Id.* D.O. Robison remarked that x-rays done previously at his office indicated "moderate to severe degenerative disk and joist [*sic*] disease with [a] marked amount of anterior lipping and spurring secondary to degenerative arthritis as well as a large kyphosis as mentioned above." *Id.* D.O. Robison determined that "(x)-rays of the knees show no abnormalities consistent with degenerative arthritis. However, she does have the bilateral patella alta ... which causes chronic patellofemoral pain and which limits any type of lifting, standing and excessive walking maneuvers." *Id.* Without drawing any specific conclusions as to whether Barry was, in fact, disabled for purposes of Social Security, D.O. Robison stated that Barry's problems were "congenital" [31] and that they "should be addressed with orthopedic evaluation, aggressive physical therapy, knee brace and splints and ultimately ... some type of surgical correction." *Id.* On March 30, 1993, D.O. Robison responded to an inquiry from Ella Manwarren of Upper Des Moines Opportunity regarding Barry's physical condition. (*Tr. 167*). In his letter, D.O. Robison stated that Barry "has moderate to severe degenerative disc and joint disease with marked arthritis as well as a large kyphosis in the upper part of her back. She has chronic, patellar-femoral pain syndrome.... The bilateral patella alta syndrome is a congenital problem and may need continued orthopedic evaluations." *Id.* D.O. Robison cautioned, however, that "I have only seen Ms. Barry on a few occasions." *Id.*

In a March 31, 1993 letter to Ms. Manwarren, Chiropractic Orthopedist Jones stated the following:

> Patient has an increased kyphotic and lordotic [32] curve both in her lumbar and tho-

---

**28.** Dysthymic is defined as "depressed." *Dorland's* at 521.

**29.** According to Dr. Anderson's report, Barry has not only been verbally abused by her brother, but sexually abused, as well. (*Tr. 165*).

**30.** The court's resources do not reveal what dowager's hump is, so I am unable to determine the applicability of this condition to Barry's disability claim.

**31.** Congenital is defined as referring to a condition "existing at, and usually before birth, regardless of their causation." *Dorland's* at 373.

**32.** The term "lordotic" refers to lordosis which is defined as an "abnormally increased curvature" similar to kyphosis. *Dorland's* at 954.

racic spine. These are accentuated way beyond normal limits as exhibited by her standing 14 X 36 AP x-ray and the lateral x-rays obtained which were both lateral thoracic and lumbar views. Patient has restricted lumbar range of motion in all spheres, thoracic motion in all movements, and cervical motion extension, right and left bending. Patient also has recurring muscle spasm in the mid thoracic and low thoracic spine. This would bother her when doing many of her physical activities.

Ms. Barry's limitations are many. Patient can not stand for any length of time. Sitting and bending forward causes increased pain in the musculature, joints, and facets of the low back. She must limit her bending, reaching, lifting to less than 15–20 lbs. and then not on a repeated basis less than 10 times per hour.

Her ability to maintain proper work habits would depend upon her degree of pain on that particular date. I'm not sure how it would affect her promptness or her accuracy in her work other than if you have chronic pain problems you would have a tendency not to be able to concentrate for long periods of time on a particular work task.

I do not know at this time of any particular positions that would be available in the Spencer area for Yvonne's limitations. Due to her background and training and educational level, I am not aware of any particular job opening at this time.

Her final diagnosis is hyperkyphotic thoracic spine and hyperlordotic lumbar spine with chronic posterior facet syndrome with myofascial fibrositis,[33] radiculitis,[34] and chronic low state muscle spasm. Prognosis for this patient is certainly not good. This patient will continue to have increasingly severe problems with her spine and increased limitations in her work ability. A spine of this interosseous disposition will become markedly and protractedly more symptom expressive as this patient ages. (*Tr. 169*).

At the administrative hearing, Barry testified that she was working as a housekeeper at the Lamplighter Motel for a salary of between $60 and $120 per week depending on how often her services were required. (*Tr. 43*). She stated that she had been seeking other employment, but added that "(i)t just seems like there isn't an awful lot to do, and I—believe me, I would have been able to find a job a long time ago if it wasn't a problem with my back and my knees, really." *Id.* Barry estimated that she can stand in one place for "around five to ten minutes [before] I start having some pain in my knees and ... it depends on what I'm doing. I have pain in my back as well. Sometimes if I sit down, it takes about five to ten minutes [before] I start having a problem with my back." (*Tr. 41*). In terms of her ability to sit for long periods, Barry testified that she can sit for "around 10 minutes or so, and then I've got to get up and walk around just a little bit." *Id.* She testified that she does not fluctuate between standing and sitting every ten minutes, but that she does "have some back pain if I sit an amount of 30 minutes. Sometimes I have to sit with a heating pad on my back, and that alleviates the pain." *Id.*

Barry testified that she has problems lifting, can lift "between 10 and 20 pounds," but "I don't even want to try to lift 20 pounds anymore." (*Tr. 45*). She also stated that she can walk "about a block and [then] I start feeling kind of uncomfortable." *Id.* In terms of daily activities, Barry testified as follows:

Well, I get up—it depends on what time I go to bed sometimes. I get up around 7:00, 8:00 and I eat breakfast and I do a few dishes for my mom if they're there. And if I have to go to work, I go to work. Then when I come home, I can't really do an awful lot after that. I can't do any

---

33. Myofacial refers to an inflammation of the muscles and their surrounding tissues. *Dorland's* at 611; 1090. Fibrositis is defined as an inflammation of the muscles which affects a person's ability to move, and which is "marked by pain and stiffness." *Dorland's* at 630.

34. Radiculitis is defined as the "inflammation of the root of a spinal nerve." *Dorland's* at 1405.

housework or anything because I just ache too bad.

*Id.* In terms of activities and hobbies, Barry testified that she is unable to draw or do latch hook work as she once had "because it would involve a lot of, well, sitting down and a lot of working with my arms. And if I work with my arms at a table or even find a table[,] that puts a little more strain between my shoulder blades and I really don't know why. It hurts too much." (*Tr. 46*).

In an exchange between she and the ALJ, Barry was asked to explain an apparent inconsistency in the record regarding her daily activities. The exchange went as follows:

Q. Now, the report here from Dr. Anderson which is dated last November indicated that your average day consisted of you live with your parents, take a shower, feed your fish, make breakfast, watch TV, the weather channel, the local news, 700 Club, check the paper for jobs, may do some laundry, may go downtown to the employment offices, eats lunch at home or if she has the funds she may go to a fast food restaurant and have a sandwich. Then going to the Northgate Shopping Mall to look into educational pursuits through High LCC. After that, she may go to the South Mall and just window shop. She generally is home in the afternoon. She does light housework in the evening, fixes supper for herself, visits the family and friends, perhaps will go with her sister to the mall again. Generally this time of year in bed 8:30, 10:00. Is that pretty much an average day?

A. It has not been—I have not had much of an average day like that within the past half year or so. I mean—

Q. Well, this is November, last November.[35]

A. That's how—

Q. It's changed dramatically since then?

A. It has changed some, yes.

Q. Why? If you haven't been doing anything, well, why should you, why should you have a change in your condition?

A. I've had that part-time job at the Lamplighter and it has been a little tougher on my back. There is more back pain. There's more knee pain. And, plus, I just do not have the money to be spending on gasoline or anything like that anymore. Sometimes I do go out, yes, but I just can't lay home all the time and vegetate. That's all there is to it.

Q. But that's what you were telling me that you can't sit more than 10 minutes or stand more than 10 minutes.

(Off and on the record.)

A. CLMT: I cannot sit or stand very much longer than 10 minutes at a time without feeling pain.

BY ADMINISTRATIVE LAW JUDGE:

Q. Now, what kind of pain are we talking about? A dull pain, a sharp pain?

A. Sharp pains, dull pains, you name it, pain radiating—

Q. All kinds?

A. Radiating between my shoulders, some down my back, up my neck. Just recently I've had problems with waking up with headaches. They don't go away.

(*Tr. 48–50*). Later in the hearing, the ALJ raised another apparent inconsistency in an exchange that went as follows:

Q. In a telephone call with somebody whose signature is initials L. Bren (phonetic) at the state disability place, you had indicated in August of last year that you were cooking meals, helped with the housecleaning, drives out on errands every day, visits with friends, attends Bible study on Thursday, attends church on Sunday, applying for jobs every week; enjoys reading, TV and radio; is helping to care for her sister's kids—two of them; can walk a block or two as long as she doesn't try to walk too fast and that you had been to voc. rehab. Your condition has changed since then?

A. Some, yes.

Q. Pardon?

A. Yes.

---

**35.** It bears repeating here that the administrative hearing took place on June 17, 1993.

Q. Okay. What do you attribute to the change in that your work activity—you're only working a couple of days a week you said.

A. Well—

Q. Why—if you're not doing anything, what's causing your condition to change?

A. Well, I started working there at the Lamplighter, and I've been doing some activities that I don't normally do.

Q. Uh-huh.

A. And it's—even if I—some days I work—some weeks I work two days. Some weeks I work three. It depends on if they need me. It's kind of hard on my back. That's all there is to it.

(*Tr. 56–7*).

Barry further testified that three weeks before the administrative hearing, she went to a chiropractor for an examination "because it was an absolute necessity thing for me to do because my back was hurting too much and I needed a back adjustment." (*Tr. 52*). "Otherwise," she added, "I'm not treating with anybody because I just don't have the money." *Id.* Barry stated that she experiences muscle spasms and knee pain which "can get pretty sharp" depending on what she is doing at a particular time. (*Tr. 53*). She explained that

> If I'm working at the—if I'm walking or if I'm working at the Lamplighter, I got to be kind of careful because if I turn my knee just right or if I hit it, it just feels like something becomes temporarily dislodged in there and it hurts.... When I get up in the morning, I've got to be kind of careful how I take my first few steps. Otherwise, I'm likely to fall over.

(*Tr. 53–4*). Barry stated that, although she experiences great pain, she can still bend over at the waist and pick things up off of the floor. (*Tr. 55*). She testified that she can no longer squat down, but "probably could" get down on one knee. *Id.*

Barry stated that she has trouble concentrating due to her pain and that "I think that's one of the reasons why I lost my job. I couldn't concentrate anymore." (*Tr. 54*). Barry elaborated about her problems with concentration by stating that "if I feel like somebody's trying to hurry me, I'm being hassled. I can't keep my mind on what I'm doing. Plus, if my back is hurting or my knees are hurting, well, then it just takes my mind off what I should be thinking about, what I'm doing." (*Tr. 59*). Barry indicated that her job at the Lamplighter caused her these sorts of problems because "the last couple of weeks or so, they told me I have to hurry a little more.... So I try to hurry. I try to bend over faster, and it adds more pain, and then I start feeling like I'm being hassled and I start getting sick sometimes...." *Id.* Regarding her depression, Barry stated that it is not caused by her not being able to work, but is instead caused by her pain. (*Tr. 58*). She explained that "(s)ometimes I, I feel like I should be doing some things, but it hurts too much sometimes." *Id.*

Vocational Expert Rick Ostrander also testified at the administrative hearing. Ostrander testified that Barry's past relevant work as a box-maker and assembler were in the exertional category of "medium" and "unskilled" under the appropriate regulations. (*Tr. 61*). Accordingly, he testified that "there would be no transferable skills." *Id.* The ALJ asked Ostrander a hypothetical question to determine whether there are substantial numbers of jobs available in the economy for someone with Barry's condition. Ostrander determined that there were. The exchange between the ALJ and Ostrander went as follows:

Q. ... I want you to consider a hypothetical person the same age as Miss Barry here. That would be 36 as of the date that she became unable. Same educational background and the same work history as indicated in the exhibit number 31.[36] Let us assume this

---

**36.** Exhibit 31 is Vocational Expert Ostrander's educational vitae. The court has reviewed the record and is unable to locate a resume for Plaintiff Barry. The court is uncertain whether the ALJ was confused about the identification of the exhibit, or whether there was, in fact, a resume for Barry somewhere in the evidence which is not in the record. Nevertheless, the

**1239**

person has been diagnosed as having ankylosing [*sic*] spondylolisthesis and she's had some degenerative disk disease and she also has experienced what they call a bilateral patella alta which is a high-riding patella. That as a result of this condition, she experiences knee, back, shoulder pain and headaches and that she's also lost her recent job and is experiencing dysthymia which is situational depression; that she's presently taking medications ... similar to [Nortriptyline].[37] .... Let us assume this person has all of the limitations, restrictions and pain that the claimant testified to here today. That limitation to sitting, standing, walking, and headaches. Assuming that hypothetical, would this person be able to go back and do the work that you described the claimant as having done in Exhibit 31?

A. No, Your Honor.

Q. All right. Take the same hypothetical question, same hypothetical person; would there be any work that that person could do that exists in this region or other regions of the country?

A. No, Your Honor.

Q. All right. Now, let's take the same person with a high school education, the same age, the same work history, and that that person has been diagnosed as having a chronic lower thoracic pain and some chronic upper thoracic pain with low back discomfort, and that she also has experienced some knee pain. But let us assume that she would be able to do light sedentary work where she can alternatively sit and stand but that she would not be restricted—that she could alternately sit and stand and that she would be able to lift according to Exhibit 29, 20 pounds occasionally, 10 pounds frequently. And that the

medication she takes would not interfere with her ability to work. Assuming that hypothetical, we're talking about either light, sedentary, unskilled jobs. Assuming that, would there be jobs that exist in this region or other regions of the country that that person could do?

A. Yes, there would, Your Honor.

Q. What kinds of jobs would those be?

A. Well, one of her past occupations which we defined as assembler small parts, many of those positions would commonly fit into that, those limitations. Many other assembler positions in similar types of factory settings would fit, assembly of small products, oil seal assembler, assembly of oil filters, many electronics assembly positions would allow for varying sitting and standing and would be light duty. Many production clerk type jobs such as production clerk jewelry would fit within that parameter.... If we took, say, Iowa, Minnesota, South Dakota as a region, there would be just as an estimate between 30,000 and 50,000 or more. They are a fairly common type of occupation. I've identified in the neighborhood of 5,000 to 10,000 in South Dakota alone, and, of course, Minnesota and Iowa are much more populous and have more of this type of light industry.

(*Tr. 62–65* ).

### B. The court's jurisdictional basis

In *Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), the United States Supreme Court described the procedural steps leading up to a district court's review of Social Security appeals as follows:

The initial disability determination is made by a state agency acting under the authority and supervision of the Secretary. 42 U.S.C. §§ 421(a), 1383b(a); 20 CFR

court is relatively certain that the ALJ was *not* asking Ostrander to assume that Barry had the same educational and work history as a vocational expert.

37. Some discussion ensued regarding the medications Barry is taking, which included Propacet and Feldene. (*Tr. 63* ). As mentioned in footnote 20, the drug prescribed for Barry which resembles nortriptyline is called Pemelor.

§§ 404.1503, 416.903 (1986). If the state agency denies the disability claim, the claimant may pursue a three-stage administrative review process. First, the determination is reconsidered *de novo* by the state agency. §§ 404.909(a), 416.1409(a). Second, the claimant is entitled to a hearing before an administrative law judge (ALJ) within the Bureau of Hearings and Appeals of the Social Security Administration. 42 U.S.C. §§ 405(b)(1), 1383(c)(1) (1982 ed. and Supp. III); 20 CFR §§ 404.929, 416.1429, 422.201 *et seq.* (1986). Third, the claimant may seek review by the Appeals Council. 20 CFR §§ 404.967 *et seq.*, 416.1467 *et seq.* (1986). Once the claimant has exhausted these administrative remedies, he may seek review in federal district court.

*Yuckert,* 482 U.S. at 142, 107 S.Ct. at 2291.

Section 1383(c)(3) of Title 42 of the United States Code provides that "(t)he final determination of the Secretary after a hearing ... shall be subject to judicial review as provided in section 405(g) of this title...." In pertinent part, 42 U.S.C. § 405(g) states the following:

> Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia.... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause

for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.... The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions....

■■■ Accordingly, the court has the power to affirm, reverse or remand the ALJ's decision, and "(w)here the record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which plaintiff is entitled, reversal is appropriate." *Thompson v. Sullivan,* 957 F.2d 611, 614 (8th Cir.1992) (citing *Fowler v. Bowen,* 866 F.2d 249, 253 (8th Cir.1989)); see also *Simmons v. United States R.R. Retirement Bd.,* 982 F.2d 49, 57 (2d Cir.1992) (citing *Thompson,* 957 F.2d at 614; *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.1980) (reversal proper where remand "would serve no purpose")); *Gavin v. Heckler,* 811 F.2d 1195, 1202 (8th Cir.1987) (reversal proper where "remand would be a futile gesture"). The court cannot, however, grant a remand merely because it is unhappy with the ALJ's result, *Melkonyan v. Sullivan,* 501 U.S. 89, 100–01, 111 S.Ct. 2157, 2164–65, 115 L.Ed.2d 78 (1991), or "'because substantial evidence would have supported an opposite decision.'" *Barrett v. Shalala,* 38 F.3d 1019, 1022 (8th Cir.1994) (quoting *Smith v. Shalala,* 987 F.2d 1371, 1374 (8th Cir.1993) in turn quoting *Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir.1984)). Further, in order to remand a case such as this one, which falls under sentence four of 42 U.S.C. § 405(g),[38] the court must either affirm, modify or reverse the decision so that it will be considered a final judgment. *Melkonyan,* 501 U.S. at 102, 111 S.Ct. at 2165; see also *Shalala v. Schaefer,* —— U.S. ——, ——, 113 S.Ct. 2625, 2629, 125 L.Ed.2d 239 (1993). With this jurisdictional basis in mind, the court now turns to the procedural history of this case and the standards to be applied upon review.

## C. Procedural background

Barry filed her application for SSI benefits on May 27, 1992. (*Tr. 68–70*). The applica-

---

**38.** Sentence four of § 405(g) provides that:
The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or re-

versing the decision of the Secretary, with or without remanding the cause for a rehearing.
42 U.S.C.A. § 405(g) (pocket part 1994).

tion was denied initially on September 18, 1992 (*Tr. 71–2; 83–4* ) and after reconsideration on January 28, 1993. (*Tr. 86–8; 102–03* ). An administrative hearing was held in this matter on June 17, 1993 in Spencer, Iowa (*Tr. 37* ), after which Administrative Law Judge Virgil E. Vail ruled, on September 25, 1993, that Barry was not disabled and therefore not entitled to SSI benefits. (*Tr. 25* ). On November 18, 1993, Barry requested a review of the ALJ's decision from the Social Security Administration Appeals Council. (*Tr. 6* ). On March 4, 1994, the Appeals Council denied Barry's request and stated that "the Administrative Law Judge's decision stands as the final decision of the Secretary in your case." (*Tr. 4* ).

Since the Appeals Council's March 4, 1994 letter stated that it represented the final determination of the Secretary, and since Barry filed this action on April 29, 1994,[39] there is no dispute that it was timely filed with this court. Therefore, Barry is entitled to a review of her case under 42 U.S.C. § 405(g), *supra.* The court will now commence to determine whether the ALJ's decision was supported by substantial evidence.

## II. ANALYSIS

### A. The "substantial evidence" standard

■ The Eighth Circuit's standard of review in Social Security cases is well-established. This Court must affirm the findings of the ALJ if they are supported by substantial evidence in the record as a whole. *Smith v. Shalala,* 31 F.3d 715, 717 (8th Cir.1994) (citing *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)); *Nelson v. Sullivan,* 966 F.2d 363, 366, n. 6 (8th Cir.1992) (citing *McMillian v. Schweiker,* 697 F.2d 215, 220 (8th Cir.1983)); 42 U.S.C. § 405(g). " 'Substantial evidence is less than a preponderance' . . ." *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (quoting *Robinson v. Sullivan,* 956 F.2d 836, 838 (8th Cir.1992)), but " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Perales,* 402 U.S. at 401, 91 S.Ct. at 1427 (quoting *Consolidated*

*Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); see also *Smith,* 31 F.3d at 717 (citing *Ghant v. Bowen,* 930 F.2d 633, 637 (8th Cir.1991)). Put another way, "(t)he standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant to deny benefits without being subject to reversal on appeal.' " *Culbertson v. Shalala,* 30 F.3d 934, 939 (8th Cir.1994) (quoting *Turley v. Sullivan,* 939 F.2d 524, 528 (8th Cir.1991)).

■ When evaluating the evidence in an appeal from the Secretary's denial of benefits, the Court must perform a balancing test, evaluating any contradictory evidence. *Sobania v. Secretary of HHS,* 879 F.2d 441, 444 (8th Cir.1989) (citing *Gavin,* 811 F.2d at 1199). "(I)f it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [this court] must affirm the [Secretary's] decision." *Orrick,* 966 F.2d at 371. Even if this court "might have weighed the evidence differently, [it] may not reverse the Secretary's decision when there is enough evidence in the record to support either outcome." *Culbertson,* 30 F.3d at 939 (citing *Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir.1992)). In other words, the court "must consider evidence that detracts from the Secretary's decision as well as evidence that supports it. [The court] may not, however, reverse the Secretary's decision merely because substantial evidence also would have supported an opposite decision." *Frankl v. Shalala,* 47 F.3d 935, 937 (8th Cir.1995) (citing *Smith,* 987 F.2d at 1373–74).

■ "Review under this standard is not a rubber stamp for the ALJ, however." *Griffon v. Bowen,* 856 F.2d 1150, 1153 (8th Cir. 1988) (citing *McMillian,* 697 F.2d at 220). The Court must at all times keep in mind that prior to granting or denying benefits, the ALJ has a duty to fully and fairly develop the record. This mandate was recently summarized as follows:

---

**39.** Clerk's Memorandum of Papers # 1, Plaintiff's Complaint, was filed on April 29, 1994.

The Secretary acknowledges that it is her " 'duty to develop the record fully and fairly, even if ... the claimant is represented by counsel.' " *Boyd v. Sullivan,* 960 F.2d 733, 736 (8th Cir.1992) (quoting *Warner v. Heckler,* 722 F.2d 428, 431 (8th Cir.1983)). This is so because an administrative hearing is not an adversarial proceeding. *Henrie v. Dep't of Health & Human Serv.,* 13 F.3d 359, 361 (10th Cir. 1993). "[T]he goals of the Secretary and the advocates should be the same: that deserving claimants who apply for benefits receive justice." *Sears v. Bowen,* 840 F.2d 394, 402 (7th Cir.1988). Moreover, "[a]n adequate hearing is indispensable because a reviewing court may consider only the Secretary's final decision [and] the evidence in the administrative transcript on which the decision was based."

*Battles v. Shalala,* 36 F.3d 43, 44 (8th Cir. 1994) (quoting *Higbee v. Sullivan,* 975 F.2d 558, 562 (9th Cir.1992) (per curiam)). With these standards in mind, the Court will now turn to the ALJ's evaluation of Barry's case.

### B. The Polaski standard and subjective pain credibility determinations

▮ "An ALJ's credibility determinations are, of course, entitled to considerable weight." *Young v. Secretary of Health and Human Servs.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir.1987)); see also *Gooch v. Secretary of Health and Human Servs.,* 833 F.2d 589, 592 (6th Cir.1987), *cert. denied,* 484 U.S. 1075, 108 S.Ct. 1050, 98 L.Ed.2d 1012 (1988); *Hardaway v. Secretary of Health and Human Servs.,* 823 F.2d 922, 928 (6th Cir.1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit allegations of pain merely because of a lack of objective evidence; instead, he may discredit subjective complaints of pain only if they are inconsistent with the record as a whole. *Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994); see also *Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir.1990) (citing *Polaski v. Heckler,* 739 F.2d 1320 (order), *supplemented,* 751 F.2d 943 (8th Cir.1984), *vacated,* 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 974, *adhered to on remand,* 804 F.2d 456 (8th Cir.1986),

*cert. denied,* 482 U.S. 927, 107 S.Ct. 3211, 96 L.Ed.2d 698 (1987)). Under *Polaski,*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;
> 5) functional restrictions.

*Polaski,* 739 F.2d, at 1321–22. In other words, under *Polaski* an ALJ is free to doubt a claimant's subjective pain complaints. However, he must support a denial of benefits based on a consideration of the abovementioned five factors. Indeed, the *Polaski* court stated that "(t)he adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Id.* (*emphasis in original*).

As the Tenth Circuit has stated, "(t)o establish disabling pain without explicit confirmation of treating physicians may be difficult. Nonetheless, the claimant is entitled to have his nonmedical objective and subjective testimony evaluated by the ALJ and weighed alongside the medical evidence." *Huston v. Bowen,* 838 F.2d 1125, 1131 (10th Cir.1988) (citing *Luna v. Bowen,* 834 F.2d 161, 164 (10th Cir.1987)); see also *Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir.1986); *Avery v. Secretary of Health and Human Servs.,* 797 F.2d 19, 21 (1st Cir.1986); *MacGregor v. Bowen,* 786 F.2d 1050, 1054 (11th Cir.1986); *Green v. Schweiker,* 749 F.2d 1066, 1070 (3d Cir.1984).

### C. Relative burdens of proof

A "disability" is defined in 42 U.S.C. § 423(d) as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (1994). A disability is found when a claimant is "not only unable to do his previous work but cannot, considering ... his age, education and work experience, engage in any other kind of substantial gainful work which exists in [significant numbers in] the national economy ... either in the region in which such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A) (1994). The disability evaluation process is found at 20 C.F.R. § 404.1520 and was thoroughly described in *Yuckert, supra*, as follows:

> The Secretary has established a five-step sequential evaluation process for determining whether a person is disabled. 20 C.F.R. §§ 404.1520, 416.920 (1986). Step one determines whether the claimant is engaged in "substantial gainful activity." If he is, disability benefits are denied. §§ 404.1520(b), 416.920(b). If he is not, the decisionmaker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments. That determination is governed by the "severity regulation" at issue in this case. The severity regulation provides:
>
> > "If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience." §§ 404.1520(c), 416.920(c).
>
> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs. §§ 404.1521(b), 416.921(b). Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, coworkers, and

usual work situation"; and "[d]ealing with changes in a routine work setting." *Ibid.*

> If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step, which determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity. §§ 404.1520(d), 416.920(d); 20 CFR pt. 404, subpt. P, App. 1 (1986). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which determines whether the impairment prevents the claimant from performing work he has performed in the past. If the claimant is able to perform his previous work, he is not disabled. § 404.1520(e), 416.920(e). If the claimant can perform this work, the fifth and final step of the process determines whether he is able to perform other work in the national economy in view of his age, education, and work experience. The claimant is entitled to disability benefits only if he is not able to perform other work. §§ 404.1520(f), 416.920(f).

*Yuckert,* 482 U.S. at 140–42, 107 S.Ct. at 2291.

"To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." *Frankl,* 47 F.3d at 937 (citing *Reed v. Sullivan,* 988 F.2d 812, 815 (8th Cir.1993)); see also *Roth v. Shalala,* 45 F.3d 279, 282 (8th Cir.1995) (citing *Locher v. Sullivan,* 968 F.2d 725, 727 (8th Cir.1992)); 20 C.F.R. § 404.1512(c); see also *Johnston v. Shalala,* 42 F.3d 448, 451 (8th Cir.1994). "If met, the burden of proof then shifts to the Secretary to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education, and

work experience." *Frankl,* 47 F.3d at 937 (citing *McCoy v. Schweiker,* 683 F.2d 1138, 1146–47 (8th Cir.1982) (en banc); 20 C.F.R. §§ 404.1520(f), 416.920(f)). See also *Johnston,* 42 F.3d at 451 (citing *Turpin v. Bowen,* 813 F.2d 165, 170 (8th Cir.1987)); *Hajek v. Shalala,* 30 F.3d 89, 92 (8th Cir.1994) (citing *Evans v. Shalala,* 21 F.3d 832, 835 (8th Cir. 1994)); *Mitchell v. Shalala,* 25 F.3d 712, 714 (8th Cir.1994); *Smith,* 31 F.3d at 717 (citing *Cline v. Sullivan,* 939 F.2d 560, 564 (8th Cir.1991); *Hajek,* 30 F.3d at 93 (citing *Evans,* 21 F.3d at 835); *Walker v. Shalala,* 993 F.2d 630, 632 (8th Cir.1993) (citing *Robinson v. Sullivan,* 956 F.2d 836, 841 (8th Cir.1992); *Reed v. Sullivan,* 988 F.2d 812, 814 (8th Cir.1993)); *Edwards v. Secretary of Health and Human Servs.,* 809 F.2d 506, 507 (8th Cir.1987); *McCoy v. Schweiker,* 683 F.2d 1138, 1142 (8th Cir.1982)).

■ In going through the sequential disability evaluation process, the ALJ determined, at step one, that Barry has not engaged in substantial gainful activity at any time subsequent to September 9, 1991.[40] At steps two and three, the ALJ concluded that although Barry suffers from "ankylosing [*sic*] spondylitis, degenerative disc disease and some arthritic lipping of the dorsal vertebral bodies, bilateral patella alta with resultant patellofemoral pain, a dysthymic disorder, and borderline personality traits," (*Tr. 12*), these impairments, either singly or in combination, do not "meet or medically equal in severity any impairment listed in Appendix 1, Subpart P, Regulations No. 4 (20 C.F.R. 404.1520(d))." (*Tr. 13*). At step four, the ALJ acknowledged that Barry cannot perform her previous work. (*Tr. 24*). Therefore, it was the Secretary's duty under step five to determine whether there are jobs available for Barry in substantial numbers in the economy. See *e.g. Smith,* 31 F.3d at 717.

■ The ALJ determined that there were several jobs available for Barry which existed in "significant" numbers in the regional economy. (*Tr. 23*). Accordingly, the issue for the court to decide is whether the ALJ's decision was based on substantial evidence. In an effort to make that determination, the court will review the ALJ's order and the record as a whole.

## D. The ALJ's credibility analysis

### 1. The ALJ's analysis of the medical evidence

In his decision, the ALJ reviewed the medical evidence in the record and concluded that Barry is not disabled. (*Tr. 16–18*). He also reviewed the claimant's age, education and work experience and came to the same conclusion. (*Tr. 24–25*). The ALJ made the express finding that "(b)ased on an exertional capacity for sedentary to light work, and the claimant's age, education, and work experience, section 404.1569[41] and Rule 201.27[42]

---

**40.** In her May 27, 1992 Application for Disability Insurance Benefits, Barry alleged that she has been disabled since September 9, 1991. (*Tr. 68*).

**41.** Section 404.1569, entitled Listing of Medical–Vocational Guidelines in Appendix 2, states the following:

> The Dictionary of Occupational Titles includes information about jobs (classified by their exertional and skills requirements) that exist in the national economy. Appendix 2 provides rules using this data reflecting major functional and vocational patterns. We apply these rules in cases where a person is not doing substantial gainful activity and is prevented by a severe medically determinable impairment from doing vocationally relevant past work. The rules in appendix 2 do not cover all possible variations of factors. Also, as we explain in § 200.00 of appendix 2, we do not apply these rules if one of the findings of fact about the

person's vocational factors and residual functional capacity is not the same as the corresponding criterion of a rule. In these instances, we give full consideration to all relevant facts in accordance with the definitions and discussions under vocational considerations. However, if the findings of fact made about all factors are the same as the rule, we use that rule to decide whether a person is disabled.

**42.** Table No. 1 of Part 404 Subpart P., Appendix 2 is entitled "Residual functional capacity: Maximum sustained work capability limited to sedentary work as a result of severe medically determinable impairment(s)." It is a chart which shows the appropriate rules based on age, education, previous work experience and whether a person is or is not disabled. According to the chart, Rule 201.27 indicates that individuals who are 18 to 44 are considered "younger individuals." Further, it indicates that if these "younger individuals" are either high school graduates or individuals with *more* education, and if their

and 202.20,[43] Table Nos. 1 and 2, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of 'not disabled.'" *Id.*

Regarding the medical evidence, the ALJ made the following observations:

The medical evidence reflects that claimant has impairments diagnosed as ankylosing spondylitis, degenerative disc disease and some arthritic lipping of the dorsal vertebral bodies, bilateral patella alta with resultant patellofemoral pain, a dysthymic disorder, and borderline personality traits. The undersigned is persuaded that the medical evidence of record is sufficient to establish that the claimant possesses impairments which can reasonably be expected to place more than minimal limitations on her mental and physical ability to perform basic work activities. Accordingly, such impairments are considered "severe" (20 C.F.R. 404.1520(c)).

However, while severe, the claimant's impairments do not, either individually or in combination, meet or medically equal in severity any impairment listed in Appendix 1, Subpart P, Regulations No. 4 (20 C.F.R. 404.1520(d)). Specifically, the claimant's ankylosing spondylitis does not result in fixation of the cervical or dorsolumbar spine at thirty degrees or more of flexion and is not accompanied by x-ray evidence of calcification of the anterior and lateral ligaments or bilateral ankylosis of the sacroiliac joints with abnormal apophyseal articulations (Section 1.05A of Appendix 1). The degenerative disc disease and arthritic lipping of claimant's dorsal vertebral bodies does not result in appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss (Section 1.05C of Appendix 1). The claimant's high-riding patella is not characterized by signs of marked limitation or abnormal motion of the knees and x-ray

previous work experience is either non-existent or unskilled in nature, then they are considered "not disabled."

**43.** Table No. 2 of Part 404 Subpart P., Appendix 2 is entitled "Residual functional capacity: Maximum sustained work capability limited to light work as a result of severe medically determinable impairment(s)." It is a chart which shows the appropriate rules based on age, education, previ-

evidence does not establish significant joint space narrowing or significant bony destruction (Section 1.03 of Appendix 1). Lastly, the claimant's nonexertional impairments (i.e., mental impairments), while satisfying the threshold condition for sections 12.04 (dysthymia) and 12.08 (borderline personality traits) of Appendix 1, do not result in degrees of functional limitation which satisfy the Part B criteria of each respective listing.

(*Tr. 12–13*). Under 20 C.F.R. § 404.1520(d) a claimant's

impairment(s) must prevent you from doing past relevant work. If we make a decision based on your current work activity or on medical facts alone, and you have a severe impairment(s), we then review your residual functional capacity and the physical and mental demands of the work you have done in the past. If you can still do this kind of work, we will find that you are not disabled.

Section 1.05 A of Appendix 1 addresses criteria for determining disability based on "disorders of the spine." It states that

Arthritis manifested by ankylosis or fixation of the cervical or dorsolumbar spine at 30 degrees or more of flexion measured from the neutral position, with X-ray evidence of:

1. Calcification of the anterior and lateral ligaments; or

2. Bilateral ankylosis of the sacroiliac joints with abnormal apophyseal articulations . . .

Section 1.05 C of Appendix 1 addresses more criteria for determining disabilities regarding "disorders of the spine," specifically,

Other vertebrogenic disorders (e.g., herniated nucleus pulposus, spinal stenosis) with the following persisting for at least 3

ous work experience and whether a person is or is not disabled. According to the chart, Rule 202.20 indicates that individuals who are 18 to 44 are considered "younger individuals." Further, it indicates that if these "younger individuals" are either high school graduates or individuals with *more* education, and if their previous work experience is either non-existent or unskilled in nature, then they are considered "not disabled."

months despite prescribed therapy and expected to last 12 months. With both 1 and 2:

1. Pain, muscle spasm, and significant limitation of motion in the spine; and

2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

Section 1.03 of Appendix 1 addresses criteria for disabilities based on "Arthritis of a major weight-bearing joint (due to any cause)." It states that

With history of persistent joint pain and stiffness with signs of marked limitation of motion or abnormal motion of the affected joint on current physical examination. With:

A. Gross anatomical deformity of hip or knee (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) supported by X-ray evidence of either significant joint space narrowing or significant bony destruction and markedly limiting ability to walk and stand; or

B. Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint and return to full weight-bearing status did not occur, or is not expected to occur, within 12 months of onset.

The ALJ concluded that Barry "possesses spinal and knee impairments which can reasonably be expected to produced some degree of pain and limitation. The pivotal question, however, is not whether the claimant experiences pain and limitation, but whether such pain and limitation rise to such an intensity, or are so intrusive, as to preclude all substantial gainful activity irrespective of the exertional or nonexertional demands of a particular job or occupation...." (*Tr. 17*). The ALJ then evaluated the medical evidence by juxtaposing it against Barry's subjective pain complaints.

■ The court is aware, based on its analysis of the "substantial evidence" standard, that its analysis of the ALJ's medical evidence evaluation is limited. Accordingly, it cannot dispute the fact that the medical evidence, standing alone, may not support Barry's claim of disability. Nonetheless, under *Hinchey*, 29 F.3d at 432, this is only half

the analysis. The ALJ must also evaluate Barry's subjective testimony before deciding on whether she is, in fact, disabled. *Ricketts v. Secretary of Health and Human Servs.*, 902 F.2d 661, 664 (8th Cir.1990) (citing *Smith v. Heckler*, 735 F.2d 312, 317 (8th Cir.1984) in turn citing *Basinger v. Heckler*, 725 F.2d 1166, 1169–70 (8th Cir.1984) ("a failure to make credibility determinations concerning [the subjective testimony of the family and others] requires a reversal and remand")). In this case, the ALJ determined that Barry was not credible and, therefore, ruled that Barry is not disabled. (*Tr. 23–25*). The court will, therefore, review the ALJ's decision and the record to determine whether the ALJ's credibility determinations were supported by substantial evidence as a whole.

### 2. Alleged contradictions in Barry's testimony

#### a. Alleged contradictions regarding medical reports

The ALJ wrote that "(p)hysical examinations of the claimant's back at various times have yielded various results." (*Tr. 16*). As an example, he compared the October 9, 1992 and March 31, 1993 reports of C.O. Jones with the January 6, 1993 report of D.O. Robison. The ALJ noted C.O. Jones's determination that Barry cannot lift weights of greater than 20 pounds and can only stand in one position for two hours. The ALJ "compared" C.O. Jones's determination with D.O. Robison's report that "the claimant possessed full flexion of her back to ninety degrees and extension to thirty degrees, and lateral bending to thirty degrees (both left and right) without any difficulty or much pain." (*Tr. 17*) and determined that the reports were conflicting.

■ The court is not persuaded that there is any conflict or contradiction in these two evaluations, and is uncertain about how any of this relates to Barry's back pain. The records from most, if not all, of the evaluating physicians in this case—including D.O. Robison—indicate that Barry has kyphosis (*Tr. 141, 166, 167*), degenerative joint diseases (*Tr. 141, 144, 154, 155, 158, 166, 167*) and arthritis (*Tr. 141, 143, 144, 146, 147, 154, 155, 158, 166, 167*). The ALJ seems to

suggest that despite these problems, Barry can lift more than the chiropractor suggested and can stand for longer than the chiropractor estimated because she has full flexion of her knees and can bend over. The court disagrees with that suggestion. The court is in disagreement, primarily because none of the doctors disputed that Barry experiences significant pain. The court also disagrees because Barry testified, and no physician's report or other evidence disputes, that her condition has gotten worse as she has attempted to work as a housemaid at the Lamplighter. What the court sees is a woman with significant back and knee conditions who is struggling to make ends meet by performing services which aggravate her present conditions and who is in great pain. What the court does not see is a person who is capable of performing light to moderate work, but is hoping to avoid doing so by filing for Social Security benefits.

Also, the court is cognizant that D.O. Robison did not express a conclusion as to whether Barry is disabled. Indeed, although D.O. Robison found no evidence of degenerative arthritis, he *did* find x-rays demonstrating "moderate to severe degenerative disk and joist [*sic*] disease with [a] marked amount of anterior lipping and spurring secondary to degenerative arthritis as well as a large kyphosis...." (*Tr. 166*). Therefore, the court is not certain that any contradiction in the evidence exist here. Therefore, the Secretary's denial of disability benefits based on this alleged "contradiction" was not based on substantial evidence and cannot be affirmed.

### 3. The lack of a physician's disability finding

■ Regarding medical opinions on whether Barry was disabled, the ALJ remarked as follows:

> Lastly, the undersigned is compelled to comment on the complete absence of any treating or examining physician or chiropractor opinion that claimant is disabled. Their respective silence as to such issue is resounding to say the least.

(*Tr. 20*). The court notes that although they never stated that Barry *is* disabled, the physicians in this case at the same time never stated that Barry *is not* disabled. Whether the physicians had stated that Barry either was or was not disabled, however, is of no consequence in this circuit. "A treating physician's opinion is 'not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data.'" *Chamberlain v. Shalala*, 47 F.3d 1489, 1494 (8th Cir.1995) (quoting *Matthews v. Bowen*, 879 F.2d 422, 424 (8th Cir.1989)); see also *Frankl*, 47 F.3d at 938 n. 1 (citing 20 C.F.R. § 404.1527(d)(2)). It is the Secretary and not the treating physician "who is responsible for determining whether or not a claimant meets the statutory definition of disability." *Frankl*, 47 F.3d at 938 n. 1 (citing 20 C.F.R. § 404.1527(e)(1)). "Although the opinion of the treating physician is to be accorded a high degree of deference by the ALJ, this deference should be limited if the treating physician's opinion consists only of conclusory statements." *Barrett*, 38 F.3d at 1023 (citing *Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir.1991)); see also *Chamberlain*, 47 F.3d at 1494 (citing *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir.1994) in turn citing *Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir.1991)) ("The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements").

■ The court can envision a case having a record which is identical to this one except for three treating physicians' reports which unequivocally stated that "this claimant is disabled." In such a circumstance, the ALJ could just as easily have cited the above case law and ruled that the doctors' opinions were not binding, either because the ultimate decision is the Secretary's, or because the statements were apparently conclusory. In such a case, the physician's findings would not be binding under prevailing Eighth Circuit case law. Based on the foregoing, the court disagrees that the lack of a medical diagnosis of disability is "resounding" as to whether Barry is actually disabled. The court accordingly finds that the ALJ lacked substantial evidence to justify denying benefits to Barry.

### 4. Barry's back and knee problems

Another alleged inconsistency raised by the ALJ involved Barry's back and knee

problems. On the one hand, the ALJ noted that

> the relevant medical evidence of record reflects that claimant was diagnosed with bilateral patella alta with resultant patello-femoral pain on October 16, 1991. Prior to that time, the claimant had presented complaints of left knee pain and swelling. However, and for the most part, her pain was relieved by anti-inflammatories such as Lodine. Nonetheless, claimant received work-related restrictions in August 1991, which limited her lifting to no more than twenty pounds and standing for no more than two hours at one time, and precluded kneeling or walking long distances.

(*Tr. 19* ). On the other hand, the ALJ wrote that

> the claimant alleges an inability to sit for more than ten minutes at one time before having to get up and move about. It is interesting to note that she later testified she can sit for thirty minutes and then has some back pain, which surprisingly can be relieved by a heating pad. Despite the claimant's allegation concerning sitting, none of her treating or examining physicians or chiropractor have ever voiced an opinion as to the claimant's ability to sit. The claimant also alleged the inability to stand for no more than five to ten minutes at one time. Here again, the record reflects that claimant has limitations with respect to standing, but such limitations are documented as no standing in excess of two hours at one time. The claimant also stated she can walk only one block at one time. However, while the medical evidence of record documents restrictions as to walking, the limitation is with respect to no *excessive* walking maneuvers (emphasis added).

(*Tr. 19–20* ). These statements regarding standing and walking were used by the ALJ as examples of Barry's "overstat[ing] her limitations." (*Tr. 19* ).

■ The court is not persuaded that Barry has overstated anything about her back

and knee problems. As the testimony cited on pages 16 through 18 of this Order demonstrates, Barry's condition may have worsened after the doctors' reports in this record were written. As the testimony demonstrated, Barry's condition "changed dramatically" in the seven months between Dr. Anderson's November, 1992 report and the June 17, 1993 administrative hearing.

It is undisputed that Barry suffers from degenerative bone problems. It is also undisputed that Barry weighed between 195 and 200 pounds at the June, 1993 hearing. (*Tr. 58* ). It is also undisputed that Barry cannot perform her previous work. (*Tr. 24* ). Further, even the ALJ acknowledged that Barry suffers from "severe" impairments.[44] Nonetheless, the ALJ was not willing to assume that Barry's condition deteriorated between November, 1992 and June, 1993.

■ The court has reviewed the record. Upon review, I believe it is *extremely* likely, given the degenerative nature of Barry's impairments and her inability to return to her past relevant work, combined with her moderately heavy weight, that Barry's ability to sit and stand could have worsened between November, 1992 and June, 1993. The testimony regarding Barry's claim of physical degeneration went, in relevant part, as follows:

A. ... I have not had much of an average day like that within the past half year or so. I mean—

Q. Well, this is November, last November.

A. That's how—

Q. It's changed dramatically since then?

A. It has changed some, yes.

(*Tr. 48* ). The ALJ asked why the condition worsened. (*Tr. 49* ). Barry answered that her job at the Lamplighter was "a little tougher on [her] back" which caused "more back pain" and "more knee pain." *Id.* In his decision, the ALJ wrote that he chose not to believe this testimony because it was in-

---

44. The ALJ wrote that "the medical evidence of record is sufficient to establish that the claimant possesses impairments which can reasonably be expected to place more than minimal limitations

on her mental and physical ability to perform basic work activities. Accordingly, such impairments are considered 'severe' (20 C.F.R. 404.1520(c)." (*Tr. 13* ).

consistent with the medical reports which were already in the record. (*Tr. 20*). The ALJ had a duty under *Battles,* 36 F.3d at 44, to fully and fairly develop the record in this case. If he was surprised or doubtful about Barry's assertion of degeneration, he should have ordered a new set of medical reports to determine her condition.

I can't help but feel that there is something unseemly about the ALJ's raising an apparent inconsistency in the record, then requiring the claimant to explain the inconsistency, then not following up on the inconsistency, but instead deciding to disbelieve the claimant and to use the inconsistency as evidence of her lack of credibility. For this reason, the court is persuaded that the ALJ violated his duty under *Battles* to provide a complete record in this case, and that he lacked substantial evidence to support his finding that Barry was lying about her ability to sit and stand without pain. To the extent that this credibility determination led to his denial of Social Security benefits, the court is persuaded that the ALJ lacked substantial evidence to make that determination.

### 5. Barry's daily activities

Along the same lines, the ALJ stated that in addition to Dr. Anderson's November, 1992 report,

> the claimant also informed the Administration on August 12, 1992, that she can take care of her personal needs without assistance, that she cooks meals and helps with the housecleaning, that she runs errands every day, that she visits with friends, attends Bible study on Thursdays and attends church every Sunday (Exhibit 13). Claimant further reported on August 12, 1992, that she applies for jobs each week, that she enjoys reading, watching television or listening to the radio, and that she helps care for her sister's children (Exhibit 13). In addition, Exhibit 12 to the record claimant stated that she shops for her own groceries and that the reason she no longer enjoys hobbies is that she does not have the money to do so.
> The claimant attempted to explain the difference between her testimony concerning activities of daily living and her description

of the same in the documentary evidence of record by noting that her condition has worsened. However, review of the medical evidence simply does not support that contention. Indeed, claimant's condition has remained relatively stable. This is evidenced by the medical evidence of record which documents that claimant has sought treatment but only on a very limited basis. Granted, the claimant alleged a lack of resources to pay for medical care. However, the alleged worsening of her condition is not supported by either the medical evidence of record or any third-party statements. In all, therefore, the inconsistencies and incongruities surrounding the claimant's activities of daily living lead to an erosion of her credibility concerning her ultimate allegation of disability. Furthermore, because the claimant's descriptions of activities of daily living as described in the medical and documentary evidence of record are consistent with one another, the undersigned is inclined to view such descriptions as the true measure of her activities of daily living. Upon doing so, the level of such activities is quite inconsistent with the allegation of disability.

(*Tr. 18–19*).

▮▮▮ Initially, the court notes that a "disability" under the Social Security Act does not mean total disability or exclusion from all forms of human and social activity. *Harris v. Secretary of the Dep't of Health and Human Servs.,* 959 F.2d 723, 726 (8th Cir.1992) (claimant's ability to cook, shop, clean, do laundry and visit friends does not constitute substantial evidence that claimant can engage in substantial activity)). "(A) claimant need not prove that he or she is bedridden or completely helpless to be found disabled." *Payton v. Shalala,* 25 F.3d 684, 687 n. 6 (8th Cir.1994) (citing *Thomas v. Sullivan,* 876 F.2d 666, 669 (8th Cir.1989)). "In order to find that a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which people work in the real world." *Id.* (citing *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982)

(en banc)). "The ability to prepare meals for dependents, occasionally visit with friends, watch TV, and read does not qualify as the ability to do substantial gainful activity ... and cannot reasonably be characterized as 'a great deal of physical activity.'" *Id.* (citing *Thomas,* 876 F.2d at 669). Accordingly, to the extent that Barry testified about performing rudimentary tasks of every day living, the court is not persuaded that this demonstrated substantial evidence that she is not disabled.

 More to the point, perhaps, if the ALJ felt compelled to discredit Barry's testimony based on the lack of medical evidence supporting her contention that her condition had worsened, he had a duty under *Battles* to order that the record be supplemented with an updated physical examination report. This was particularly necessary, given the undisputed fact that Barry's condition is degenerative. Similarly, if the ALJ felt that the record on this point would have been clearer with additional third party testimony, *Battles* required him to keep the record open and request further testimony.

 As stated earlier, but rephrased here, the ALJ does a disservice to the Social Security Administration, claimant Barry and the court by personally interviewing Barry, raising some apparent inconsistencies, not pursuing those "inconsistencies," then, in effect, "sandbagging" Barry by using these so-called "inconsistencies," against her in his credibility analysis. Without pursuing those alleged inconsistencies, the ALJ was without substantial evidence to find that Barry was not credible regarding the deterioration of her physical condition. The court, therefore, is unable to affirm the Secretary.

### 6. *Barry's asserted lack of concentration*

The ALJ discredited Barry because of her assertion that her pain has affected her ability to concentrate. Specifically, the ALJ stated that

> Claimant alleges that her pain is so intense and so constant that it interferes with her ability to concentrate. The problem with such allegation is that it is entirely without support. Indeed, claimant never com-

plained of any difficulty concentrating secondary to any examining or treating physician. Moreover, upon his psychological evaluation of the claimant, Dr. Anderson indicated that the claimant possesses the ability to maintain attention and concentration and pace (Exhibit 26). Furthermore, the claimant engages in activities such as reading and driving a vehicle which undoubtedly require the ability to maintain sustained concentration. The inconsistencies surrounding the claimant's allegation of problems concentrating secondary to pain immediately erode the credibility of her allegation of severe and disabling pain.

(*Tr. 19*).

The court has reviewed the record regarding Barry's assertion that she cannot concentrate due to her pain. It is true that no medical reports speak to this issue and that it appeared anew at the administrative hearing. It is also true that driving a car and reading require an ability to concentrate. However, reading and driving a car do not require the kind of physical exertion, such as bending and lifting, which cause the sort of distracting pain Barry complains of. The ALJ admitted as much when he stated that "(a)t [the] hearing, the claimant averred she takes Propacet for pain and Feldene as an anti-inflammatory. She stated she used to take just Tylenol prior to taking the job as a housekeeper, but it no longer relieves her pain." (*Tr. 20*). Nonetheless, the ALJ tried to discount Barry's pain by stating that "(a)s to the efficacy of her prescribed medications, the claimant has never complained of any problem relative to lack of pain relief to any treating or examining physician." *Id.*

 I find this statement disingenuous in the context of this case. The ALJ would have Barry and this court believe that she is somehow no longer in pain because she takes pain medication. Such an assertion assumes too much and clearly ignores all of medical evidence demonstrating the existence of Barry's pain, even with medication, as well as Barry's testimony to the effect that, despite her medications, she is in great

pain. It also ignores C.O. Jones's [45] March 31, 1993 letter, which stated that Barry's "ability to maintain proper work habits would depend upon her degree of pain on that particular date.... (I)f you have chronic pain problems you would have a tendency not to be able to concentrate for long periods of time on a particular task." (*Tr. 169*).

■■■ As stated earlier, the ALJ had a duty under *Battles* to develop the record regarding Barry's assertions that her pain is so great that it prevents her from concentrating. The court believes this was especially important given Barry's statements (cited twice above) regarding the exacerbation of her condition after November, 1992, at a time when she was financially unable to see another physician and thereby document her increased pain. Here again, the ALJ reviewed Barry's testimony and disregarded it without giving her the benefit of another evaluation. In my view, if the ALJ did not believe that Barry's condition had worsened, then he had a duty, upon hearing her assertions to that effect, to supplement the record. He failed to do so. Accordingly, the ALJ's denial of benefits was not based on substantial evidence in the record as a whole.

### E. The hypothetical questions

#### 1. Vocational analysis required

"When evaluating whether a claimant is able to return to [her] past work, the ALJ is required to follow the appropriate guidelines.

If we cannot make a decision based on your current work activity or on medical facts alone, and you have a severe impairment, we then review your residual functional capacity and the physical and mental demands of the work you have done in the past. If you can still do this kind of work, we will find that you are not disabled."

*Groeper v. Sullivan*, 932 F.2d 1234, 1238 (8th Cir.1991) (quoting 20 C.F.R. §§ 404.1520(e); 416.920(e)).

In our case, the ALJ determined that Barry cannot return to her past relevant work. (*Tr. 22*). Accordingly, he performed a residual functional capacity analysis by consulting with vocational expert Ostrander. The court will review the ALJ's analysis to determine whether the ALJ erred in relying on Ostrander's conclusions.

In his decision, the ALJ wrote that

(t)he operative hypothetical question instructed the vocational witness to assume a hypothetical individual who possessed the same vocational profile as that possessed by the claimant. The vocational witness was further instructed to assume that the hypothetical individual had been diagnosed with impairments that caused chronic lower thoracic and upper thoracic pain, knee pain, and low back pain. The vocational witness was further instructed to assume that the hypothetical individual possessed the ability to perform sedentary to light exertional work but that such hypothetical individual needed to alternate between sitting and standing throughout an eight-hour workday. However, such hypothetical individual could lift twenty pounds on an occasional basis and ten pounds on a frequent basis. Lastly, the vocational witness was instructed to assume that the hypothetical individual took medications

---

45. The court is aware that under the regulations, a chiropractor's report is not given as much evidentiary weight as a medical doctor's report. *Walker*, 993 F.2d at 632 n. 2 ("(T)he Secretary does not acknowledge chiropractors as 'acceptable medical sources' ... and their opinions are therefore accorded less weight than those of medical doctors"); 20 CFR 404.1513. Nonetheless, the court notes that in evaluating Barry's condition regarding sitting, the ALJ indicated that he was considering all reports in the record when he stated that "(d)espite the claimant's allegation concerning sitting, none of her treating or examining physicians or chiropractor have ever voiced an opinion as to the claimant's ability to sit." (*Tr. 19*). As will be discussed more

fully *infra*, the ALJ also referred to this March 31, 1993 letter when he estimated that Barry had the physical capacity to lift as much as 20 pounds. Because the ALJ indicated that he was considering the chiropractor's reports in his analysis, and because the ALJ did not state that he was giving those reports any less weight in his analysis than the reports of the treating physicians, the court believes it is on firm footing when it cites the chiropractor's report as evidence of medical evidence supporting Barry's assertion of pain which affects her ability to concentrate. For that reason, this court is persuaded that this portion of C.O. Jones's letter should not have been ignored.

but that such medications would not interfere with her ability to work. When asked whether such a hypothetical individual could perform other work existing in significant numbers in the national economy, the vocational expert responded in the affirmative. He cited representative examples of such jobs as those found in occupations such as assembler, small parts; assembler, oil seal and oil filter; assembler, electronics; and production clerk. The vocational expert indicated the representative examples allowed for sitting and/or standing throughout an eight-hour workday (with normal breaks), that none of the jobs were restricted by gender, and that in many places, employers placed mats on the surface to lessen the stress involved in sitting and/or standing. The vocational expert specifically stated that such positions number between 30,000 and 50,000 in the regional economy consisting of Iowa, Minnesota and South Dakota.

The claimant's representative was then given an opportunity to cross-examine the vocational witness or to propose hypothetical of his own. However, he declined to do so.

The undersigned accepts the vocational witness as being objective and professionally reliable.... Therefore, as work exists in significant numbers in the regional economy consisting of Iowa, Minnesota and South Dakota which can be performed within the claimant's accepted limitations, it cannot be established that the claimant is disabled within the meaning of the Social Security Act, as amended.

(*Tr. 23* ).

■ "A vocational expert's testimony based upon an insufficient hypothetical question does not constitute substantial evidence." *Chamberlain*, 47 F.3d at 1495 (citing *Shelltrack v. Sullivan*, 938 F.2d 894, 898 (8th Cir.1991)); see also *Greene v. Sullivan*, 923 F.2d 99, 101 (8th Cir.1991) (citing *Douglas v. Bowen*, 836 F.2d 392, 396 (8th Cir.1987) ("If the question is inadequate, the response to it is not substantial evidence sufficient to

uphold the ALJ's decision")). "While it is clear that 'questions posed to vocational experts ... should precisely set out the claimant's particular physical impairments,' [*Greene*, 923 F.2d at 101],[46] a proper hypothetical question "is sufficient if it sets forth the impairments which are accepted as true by the ALJ." *House v. Shalala*, 34 F.3d 691, 694 (8th Cir.1994) (citing *Roberts v. Heckler*, 783 F.2d 110, 112 (8th Cir.1985)). This court must therefore determine whether the ALJ's hypothetical questions adequately depicted Barry's condition.

■ For reasons stated above, the court is persuaded that the ALJ improperly discounted Barry's testimony by opting not to believe her subjective determination that her condition had worsened between November, 1992 and the June, 1993 hearing. The ALJ's improper discounting of that testimony carried over into the content of the questions asked of vocational expert Ostrander, the text of which is laid out on pages 19 through 22 of this Order. In other words, there is no mention in the hypothetical questions about a condition which may have worsened in six months. Given the fact that the ALJ should have pursued the matter of Barry's physical condition further, the court is persuaded that the hypothetical questions were flawed on that basis, alone.

■ But, there were other problems with the ALJ's hypothetical questions, as well. The ALJ cited Exhibit 29—C.O. Jones's March 31, 1993 letter to Upper Des Moines Opportunity, Inc. (*Tr. 168–69* )—and described in his hypothetical question a woman who "would be able to lift according to Exhibit 29, 20 pounds occasionally, 10 pounds frequently." (*Tr. 64* ). The ALJ misrepresented what Exhibit 29 actually stated. Exhibit 29 stated that Barry "must limit her bending, reaching, lifting to *less than 15–20 lbs.* and then not on a repeated basis less than 10 times per hour." (*Tr. 168* ). Nothing in Exhibit 29 says that Barry could lift as much as 20 pounds occasionally. Accordingly, the response to this question cannot be

---

46. See also *Smith*, 31 F.3d at 717 (quoting *Ledoux v. Schweiker*, 732 F.2d 1385, 1388 (8th Cir.1984) in turn quoting *Tennant v. Schweiker*, 682 F.2d 707, 711 (8th Cir.1982)); see also *Totz v. Sullivan*, 961 F.2d 727, 730 (8th Cir.1992).

deemed as substantial evidence upon which the ALJ could have made a residual functional capacity determination. See *Chamberlain,* 47 F.3d at 1495.

■ Another problem with the hypothetical question was that it ignored Barry's assertion that her pain can interfere with her ability to concentrate at work. For reasons stated above, the court is persuaded that this assertion should have been more deeply explored by the ALJ and should not have been dismissed out of hand. The court finds it interesting that the ALJ decided to refer to C.O. Jones's report regarding Barry's lifting capabilities (however inaccurate that reference was), yet chose to ignore C.O. Jones's observation that Barry's "ability to maintain proper work habits would depend upon her degree of pain on that particular date" since "if you have chronic pain problems you would have a tendency not to be able to concentrate for long periods of time on a particular work task." (*Tr. 169* ). The court believes that the ALJ may have ignored this portion of C.O. Jones's observations because it did not lead him to the conclusion he was aiming for, namely a justification for denying benefits to Barry.

> As the Eighth Circuit stated recently,
>
> (u)nless the hypothetical question comprehensively describes the limitations on a claimant's ability to function, a vocational expert will be unable to accurately assess whether jobs do exist for the claimant. Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision.

*Smith,* 31 F.3d at 717 (citing *Ekeland v. Bowen,* 899 F.2d 719, 722 (8th Cir.1990)). Based on the foregoing, the court does not find that the vocational expert's testimony constituted substantial evidence, and the ALJ should not have relied on his determination that there were substantial numbers of jobs in the economy which Barry is able to perform.

### III. CONCLUSION

■ The medical evidence in the record does not definitively establish that Barry is disabled. However, under *Polaski* and its Eighth Circuit progeny, this lack of objective medical evidence was not enough evidence, standing alone, for the ALJ to rely on in denying Barry's disability claim. Instead, the *Polaski* line of cases impose a duty on the ALJ to do a credibility determination to establish that the record as a whole lacked substantial evidence of a disability. None of the credibility issues cited by the ALJ constituted substantial evidence of no disability. The ALJ erred in discounting Barry's subjective complaints of back pain based on so-called "contradictions" in the medical reports, since no such contradictions existed. The ALJ also erred in discounting Barry's subjective pain complaints on the basis that no physician had ever written that she was, in fact, disabled. The ALJ further erred in not believing Barry's assertion that her overall condition has worsened because he did not supplement the record on that point. Lastly, the ALJ inappropriately relied on the vocational expert's answers to hypothetical questions because the questions were flawed.

■ As a result, the ALJ lacked substantial evidence in the record to justify his denial of Barry's disability benefits. Since the main problem with the ALJ's analysis had to do with his failure to fully and fairly develop the record, the court is persuaded that this case should be reversed and remanded. *Shelltrack,* 938 F.2d at 898 (remand appropriate to allow the ALJ to fully and fairly develop the record regarding claimant's alcoholism).[47] Upon remand, the ALJ is to reevaluate his decision in light of the issues discussed in this Order.[48]

---

**47.** This court would call Barry's attorney's attention to the recent United States Supreme Court decision of *Shalala v. Schaefer,* —— U.S. ——, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993) which holds that a remand under sentence four of 42 U.S.C. § 405(g) is a final judgment such that the 30–day period for filing an application for fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, begins immediately upon expiration of the time for appeal of the remand.

**48.** In her brief, Barry asked the court to hold an evidentiary hearing in this matter. (*Def. br. at 4* ). In light of this Order, I am persuaded that such a hearing is not required.

For the reasons set forth above, judgment shall be entered reversing and remanding this case to the Secretary for further review.

**IT IS SO ORDERED.**